# EXHIBIT 1

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

**CASE NO.:**

JAZWARES, LLC, a Delaware
Limited Liability Company, KELLY
TOYS HOLDINGS, LLC, a Delaware
Limited Liability Company, KELLY
AMUSEMENT HOLDINGS, LLC, a
Delaware Limited Liability Company,
And JAZPLUS, LLC, a Delaware
Limited Liability Company,

      Plaintiff,

vs.

BUILD-A-BEAR WORKSHOP, INC.,
a Delaware Corporation,

      Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiffs, Jazwares, LLC, Kelly Toys Holdings, LLC, Kelly Amusement Holdings, LLC,
and Jazplus, LLC (collectively, "Plaintiffs" or "Kelly Toys"), by and through the undersigned
counsel, hereby sue Defendant, Build-A-Bear Workshop, Inc. ("Defendant" or "Build-A-Bear"),
and, for their Complaint, Plaintiffs state the following:

## INTRODUCTION

1. The facts of this case are truly concerning.

2. Plaintiffs (who are either affiliated entities, governed by common ownership,
governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute
Squishmallows) are among the world's leading manufacturers and distributors of high-quality toys
and other consumer products. In 2016, their distinctive line of plush toys branded

[2532761/4]                                      1

DocuSign Envelope ID: A6FC7479-44B4-4202-BC67-E920FC86B499

"Squishmallows" was released. Often referred to as just "Squish," these soft, huggable friends immediately appealed to adults and children alike. Consumers throughout the United States began collecting Squishmallows and even started online communities to track the availability of new Squishmallows as they were released. Celebrities like Lady Gaga and Kim Kardashian have posted their collections of Squishmallows on social media. And major American publications, including *The New York Times*, have profiled the broad popularity of the Squishmallows products worldwide. As one consumer remarked about her Squishmallows plush: "It just brings me happiness and that warm and fuzzy feeling."[1]

3.    Squishmallows have become a phenomenon, rapidly experiencing breakaway success and quickly turning into a coveted collectors' item with an avid fanbase. Rather than competing fairly in the marketplace by creating its own  unique concepts and product lines, Defendant Build-A-Bear, a company worth over 300 million dollars, decided that it would be easier to simply copy, imitate, and profit off of the popularity and goodwill of Squishmallows, all in the hopes of confusing consumers into buying Build-A-Bear's

---

[1]  Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 16, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

products instead. Build-A-Bear is even using the same manufacturer as Squishmallows in an attempt to gain access to the Squishmallows trade dress.

4.    In January 2024, Build-A-Bear announced the release of its "Skoosherz" plush toys. As seen herein, the Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters;



**Squishmallows Original Product**    **Skoosherz Copycat Product**

simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior. And, likely noticing that consumers refer to Squishmallows as Squish, Build-A-Bear named its line Skoosherz to evoke an association with the word "Squish."

5.    Even worse, Build-A-Bear has been trying to trick customers in the marketplace who are looking for Squishmallows into buying their own Skoosherz instead. Indeed, the similarities have not gone unnoticed—immediately upon the launch of Skoosherz, multiple media outlets have already referred to Skoosherz as "Squishmallow-like" and "Squishmallow-adjacent."[2] Consumers have likewise taken no time to identify Build-A-Bear's attempt to replicate the

---

[2] Josh Coulson, *Build-a-Bear Reveals Its Squishmallow-Like Skoosherz Line,* (Jan. 11, 2024), https://www.thegamer.com/build-a-bear-squishmallow-like-skoosherz/.

Squishmallows trade dress, commenting that Skoosherz are "like a worse Squishmallow" and that Build-A-Bear is "just trying to copy Squishmallow[s]" and is "ripping off Kellytoys." Others have noted that Skoosherz "look like cheap squishmallow knockoffs," even expressing that "they literally used the most popular squishmallow animals/designs."

6.      Build-A-Bear's efforts have created substantial and actual confusion even in the short time that they have been available. For example, a confused consumer asked on the Build-A-Bear Instagram post announcing its newest line, Skoosherz, "so now ur making squishmallows?"

7.      Build-A-Bear's actions have already caused significant harm. For example, customer confusion has and will continue to lead to lost potential customers, sales, and market share.

8.      For these reasons and those that follow, this is a straightforward case of trade dress infringement. Kelly Toys Holdings, LLC owns the popular and distinctive trade dress in Squishmallows, and Build-A-Bear is willfully infringing those trade dress rights. Through this action, Kelly Toys seeks monetary and injunctive relief to stop Build-A-Bear's copycat efforts and put an end to consumer confusion.

## PARTIES, JURISDICTION, & VENUE

9.      This is an action for injunctive relief and damages in excess of fifty thousand dollars ($50,000.00), exclusive of attorneys' fees and costs.

10.     Plaintiff Kelly Toys Holdings, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

11.     Plaintiff Jazwares, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

12.    Plaintiff Kelly Amusement Holdings, LLC is a Delaware limited liability company with its principal place of business in Syosset, New York.

13.    Plaintiff Jazplus, LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

14.    Plaintiffs are either affiliated entities, governed by common ownership, governed by intercompany agreements, or otherwise have the right to sell or otherwise distribute Squishmallows.

15.    Defendant Build-A-Bear is a consumer toy corporation company organized under the laws of Delaware with its principal place of business in St. Louis, Missouri.

16.    Defendant Build-A-Bear is subject to the jurisdiction of this Court pursuant to Florida Statutes Section 48.193(1)(a)(1) because it operates, conducts, engages in, and carries on a business venture in Broward County, Florida.  Specifically, Build-A-Bear is registered to do business in Florida and has over twenty locations in Florida where Build-A-Bear sells its products, including the infringing Skoosherz.  The infringing Skoosherz are also available for order online via Build-A-Bear's website and pick up at physical locations in Florida.  In order to sell Skoosherz in Build-A-Bear's Florida branches, the infringing articles were either manufactured in or shipped to Florida.

17.    Venue is proper in this Court pursuant to Florida Statute § 47.051 in that Defendant Build-A-Bear has numerous stores located in this county and in that Plaintiff Jazwares, LLC is headquartered in this county, giving rise to injuries sustained in this county.


## FACTS

**A. World Famous Squishmallows**

[2532761/4]                                                          5

DocuSign Envelope ID: A6FC7479-44B4-4202-BC67-F920FC86B499

18.     Kelly Toys is an innovative and highly successful creator, manufacturer, distributor, and seller of unique plush toys, including its Squishmallows line of plush toys under the Squishmallows brand.



19.     In 2016, Kelly Toys conceived of and began creating its Squishmallows line of plush toy designs that share common, unique features distinguishing them from the goods of others.    In essence, these creative development efforts produced an entirely new class of plush toys that has carved a previously non-existent niche in the marketplace.

20.     From 2016 to the present, Kelly Toys has expended large sums of money in developing, advertising, and promoting the Squishmallows trade dress, and the product designs embodying it, throughout the United States. In fact, Kelly Toys spends approximately $1,000,000 annually in direct to consumer and business-to-business advertising in connection with its Squishmallows products that are well known (and well loved) for their distinctive look.

21.     On March 31, 2020, non-party Kellytoy Worldwide, Inc., the previous holder of the trade dress rights at issue, assigned all legal title to the distinctive trade dress associated with the Squishmallows products to Plaintiff Kelly Toy Holdings, LLC.    Accordingly, Kelly Toys Holdings, LLC has been and is the sole owner of all right, title, and interest in and to the Squishmallows products (including the Squishmallows trade dress discussed herein) that possess

unique, recognizable, and distinguishing features that are common across much of the Squishmallows line.

22.    Kelly Toy Holdings, LLC provides the rights to the remaining Plaintiffs, Jazwares, LLC, Kelly Amusement Holdings, LLC, and Jazplus, LLC, to sell and distribute the Squishmallows products. Plaintiffs are all related companies that each independently have the ability to inspect and monitor the Squishmallows products and to maintain the products' quality. Each Plaintiff thus has a cognizable interest in the infringement at issue.

**B. Squishmallows Has a Distinctive Trade Dress**

23.    Kelly Toys sells a broad range of Squishmallows products featuring the iconic trade dress, and whose overall look and image—and in particular but without limitation its shapes, colors, textures and graphics—serve as a distinctive source identifier to the consuming public. Though not easily reduced to writing, these features include: (1) substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters; (2) simplified Asian style Kawaii faces with repeating



and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts, and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such as eyes, nostrils, and/or mouths; (4) distinctive

contrasting and non-monochrome coloring; and (5) short-pile exterior (collectively, the "Squishmallows Trade Dress").

24.     The Squishmallows Trade Dress, when viewed as a whole, presents a non-functional look that is *uniquely* associated with Squishmallows.  The aesthetic features of the Squishmallows Trade Dress do not have utilitarian functionality, as evidenced and underscored by the following facts: (1) the unique combination of the egg-shaped characters, simplified Kawaii face and repeated egg/bell shapes, embroidered facial features, distinct coloring, and velvety texture yields no utilitarian advantage over other plush toys; (2) there are innumerable alternative stylistic plush toy features available to and used by competitors, including, (i) countless alternative plush toy shapes (e.g. traditional animal designs as opposed to Squishmallows' whimsical, abstract renditions of animals and characters), (ii) numerous alternative means to depict facial features (e.g. plastic or bead eyes, features emulating realistic animals, countless different facial expressions); (iii) myriad alternative shell materials (e.g. terrycloth, long pile plush, velboa, satin), (iv) countless alternative stuffing materials available (e.g. beans, cotton, hard foam, wool, etc.), and (v) innumerable alternative plush designs and combinations of features actually used and available in the marketplace; (3) even if there were some utilitarian advantages of the Squishmallows Trade Dress, Kelly Toys' advertising does not tout or market those advantages; and (4) the Squishmallows Trade Dress is not the result from comparatively simple or inexpensive methods of manufactures vis-à-vis other plush toys.

25.     Further, Squishmallows Trade Dress, when viewed as a whole, does not have aesthetic functionality, as protection of the specific combination of these aesthetic features would not impose a non-reputation-related competitive disadvantage against competitors.  Competitors have successfully used innumerable alternative design elements and combinations of those

elements, and the specific combination of the Squishmallows Trade Dress features does not serve an aesthetic function wholly independent of any source identifying function. To the contrary, the Squishmallows Trade Dress was specifically designed to distinguish—and has succeeded in distinguishing—the source of products embodying the Squishmallows Trade Dress from the source of other toys. Thus, any advantage gained from the specific combination of aesthetic features comprising the Squishmallows Trade Dress is based on Kelly Toys and Squishmallows' reputation, as the specific combination of aesthetic features comprising the Squishmallows Trade Dress is highly distinctive and has become associated in the minds of the consuming public with plush toy products of the highest quality, originating from a single source: Squishmallows.

## C. Squishmallows Are Distinctive and Popular

26. Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of the Squishmallows line. And due to Kelly Toys' distinctive designs, robust marketing efforts, media coverage, and market penetration, the Squishmallows Trade Dress has acquired distinctiveness in the marketplace when applied to plush toys. As a further result of Kelly Toys' extensive promotional activities and widespread display of Squishmallows directed to the public and as a result of Kelly Toys' fairness and integrity mentioned above, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered only by Plaintiffs. The Squishmallows Trade Dress thus embodies valuable goodwill and consumer recognition associated with it. As a result, that trade dress has valuable goodwill and consumer recognition associated with it and has come to symbolize a secondary meaning of the exemplary reputation of Kelly Toys.

27.    In addition to being original and inherently distinctive, the Squishmallows Trade Dress is also widely recognized by consumers.  A simple Internet search using the Google search engine yields, for example, about 48,100,000 "hits" for the search term "Squishmallows."

28.    Beyond marketing and selling Squishmallows through thousands of retail stores nationwide, Kelly Toys additionally markets and sells its Squishmallows via its website www.squishmallows.com and on www.jazwares.com/brands/squishmallows, which each feature dozens of photographs of its plush toys and models holding its Squishmallows—some of which were directly copied by Build-A-Bear.

29.    Kelly Toys also actively engages in promoting its line of Squishmallows products through its numerous social media accounts, including on Instagram, TikTok, Facebook, and Twitter.  Indeed, Kelly Toys' legion of loyal fans of its line of Squishmallows have been extremely engaged on social media, including TikTok, Instagram, and Facebook, demonstrating their awareness and affection for Kelly Toys' Squishmallows.  Squishmallows videos have been viewed more than 11 billion times on TikTok and fans have posted Squishmallows content more than 1 million times on Instagram.

30.    Kelly Toys' Squishmallows have become a phenomenon—they have turned into a collectors' item, with their avid fanbase of all ages searching high and low to collect as many of the over 3,000 different Squishmallows characters as possible.

31.    Indeed, sales of Squishmallows increased over 300% in 2022 alone, with sales soaring to over $200 million worldwide.

32.     Further adding to their recognition and secondary meaning in the marketplace, Squishmallows have been featured in over 300 publications, including magazines, press articles, reviews, and videos, including many mainstream media publications such as the Washington Post, the New York Times, TIME Magazine, Forbes, The Guardian, the New York Post, the Costco Connections Magazine, People Magazine, Seventeen Magazine, and many others.  By way of example, the Washington Post characterized Squishmallows as "the hottest toy on the market" and described its avid fanbase as follows: "The fandom is often likened to the Beanie Baby craze — and on its way to be an enduring brand like Hello Kitty and Pokémon."[3]



33.     The New York Times has proclaimed that "Squishmallows are Taking Over,"[4] Forbes named Squishmallows "2022's Must-Have Christmas Toy,"[5] and The Guardian has

---

[3] Jaclyn Peiser, *Adults Are Driving Sales of the Hottest Toy on the Market: Squishmallows*, Wash. Post. (June 25, 2023), https://www.washingtonpost.com/business/2023/06/24/squishmallows-toy/.

[4] Taylor Lorenz, *Squishmallows Are Taking Over*, N.Y. Times (March 18, 2021), https://www.nytimes.com/2021/03/16/style/squishmallows.html.

[5] Mark Faithfull, *Squishmallows Going Viral, Warren Buffet and 2022's Must-Have Christmas Toy,* Forbes (Dec. 13, 2022), https://www.forbes.com/sites/markfaithfull/2022/12/13/squishmallows-going-viral-warren-buffett-and-2022s-must-have-christmas-toy/?sh=692f77db22ad.

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499

recognized the toy's rise in popularity on social media, writing that "Squishmallows go from TikTok sensation to top Christmas toy."[6]

34.    Squishmallows' widespread popularity is further demonstrated by its recent October 2023 feature on the cover of Costco Connections, the magazine circulated monthly to nearly 15 million Costco members nationwide with advertisements for products sold at Costco, raving that "Squishmallows have taken over the toy world," and that "as toy stores go, the marshmallow-like plush toy's meteoric rise to the top of the $100 billion global toy market is one for the ages."[7]

35.    Squishmallows' fandom ranges across all ages, from children to teens to adults. Even celebrities like Kim Kardashian and Lady Gaga have identified themselves as avid devotees of the brand, and have published messages and photos of their Squishmallows collections on their social media accounts:



---

[6] Zoe Wood, *Squishmallows Go From TikTok Sensation to Top Christmas Toy*, Guardian (Dec. 9, 2022), https://www.theguardian.com/business/2022/dec/09/squishmallows-go-from-tiktok-sensation-to-top-christmas-toy.

[7]    Mark    Caldwell,    *Soft    Sell*,    Costco    Connection,    Oct.    2023,    at    22, https://mobilecontent.costco.com/live/resource/img/static-us-connection-october-23/US_October_Connection_2023.pdf.

DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499



36.     In September of 2022, Squishmallows was awarded the coveted "Toy of the Year," "Plush Toy of the Year," and the "People's Choice" awards by The Toy Foundation. Squishmallows are so popular that they have been identified as the most popular toy brand across 41% of the U.S. states—far ahead of other well-known mega brands such as Hot Wheels, Lego, Nintendo Switch, Nerf, and Play-Doh.

37.     Due to Squishmallows' massive success and popularity, Squishmallows have created a secondary meaning in the marketplace and consumers associate the high-quality Squishmallows toys with Kelly Toys and the Squishmallows Trade Dress.

### D.  Build-A-Bear's Skoosherz as a Copycat of Squishmallows

38.     True to its name, Build-A-Bear is best known for providing a place for people to create their own customizable toys.  Build-A-Bear offers a number of premade, unstuffed plush animals and characters that consumers can stuff themselves to build their own toy.  Consumers

can also customize their plush toy by purchasing audio recordings to incorporate inside the plush toy, clothing for the plush toy, and other accessories.

39.      On January 11, 2024, Build-A-Bear launched Skoosherz, a line of already complete (stuffed, stitched, etc.) plush toys that copies and imitates Squishmallows.  The Skoosherz products are a radical departure from Build-A-Bear's typical products.  Indeed, Skoosherz lack all the customizable aspects that Build-A-Bear is known for.  Consumers cannot go into a Build-A-Bear Workshop and build their own Skoosherz.  Instead, Skoosherz are pre-made and available for purchase in the same way any traditional manufacturer would sell a toy—and the same way Squishmallows are sold.

40.      In other words, instead of maintaining its original business practice of allowing consumers to create their own toys, Build-A-Bear now seeks to trade off the goodwill of Squishmallows by marketing obvious copycat products—plush toys that look almost identical to popular Squishmallows.  To be clear, Build-A-Bear is not licensed or otherwise authorized by Kelly Toys to market or distribute products embodying the Squishmallows Trade Dress.

41.      Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

42.      Build-A-Bear does not just copy the shape, material and general characteristics of Squishmallows, Build-A-Bear went design by design and made an almost exact replica of each Squishmallows design; Squishmallows has a rainbow bear, Build-A-Bear made a rainbow Skoosherz; Squishmallows has a green frog, Build-A-Bear made a green frog Skoosherz; Squishmallows has a pink cow, Build-A-Bear made a pink cow Skoosherz. This list goes on and is not complete.

43.     Dinosaurs, axolotls, and soon vegetables—Build-A-Bear made sure that each of its original five Skoosherz was an exact copy of a popular Squishmallows character. This includes the beloved and extremely unique Squishmallows axolotl, which Build-A-Bear ensured to copy with precision.   Side by side comparisons of Squishmallows and just a few of the copycat Skoosherz products plainly show how striking the similarities are:

| Squishmallows Original Product | Skoosherz Copycat Product |
| --- | --- |
|  |  |





44. Build-A-Bear is already working on creating additional infringing Skoosherz characters, including characters that copy the widely-popular fruit and vegetable Squishmallows.

45. Even worse, Build-A-Bear not only parroted Squishmallows, but it also tricked Squishmallows' manufacturer into creating the infringing Skoosherz copycat products. Specifically, Build-A-Bear reached out to the Squishmallows manufacturer (with whom Kelly Toys has an airtight confidentiality contract "Manufacturer Contract") and asked the manufacturer

to create a Squishmallows look-alike. A true and correct copy of Pursuant to the Manufacturer Contract is attached hereto as **Exhibit 1**.

46.    Plaintiffs are informed and believe that when the manufacturer expressed concerns that the Skoosherz sought to be manufactured were Squishmallows copycats, Build-A-Bear first incorrectly represented that such copycat products were permitted because the products were sold in the public domain, and then sent another correspondence directing the manufacturer and produce the violative goods.

47.    There can only be one explanation for Build-A-Bear's insistence on both using the same manufacturer as Squishmallows and proceeding with its copycat product despite the manufacturer's warning: Build-A-Bear intended on misappropriating the Squishmallows Trade Dress and hoped to leverage Squishmallows' confidential information in the manufacturer's possession.

**E. Build-A-Bear's Actions Have Caused Great Consumer Confusion**

48.    Not only has Build-A-Bear created Skoosherz to visually and tactilely mirror Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead. By naming its products that so closely resemble Squishmallows Skoosherz, Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead.

49.    Build-A-Bear has sought to market off of this confusion by portraying its Skoosherz as the "most squishable," and advertising that consumers can "Squish Em," plainly seeking to create an association between the infringing Skoosherz and the wildly popular Squishmallows, or "Squish:"









50. Build-A-Bear's descriptions of individual Skoosherz toys similarly seek to associate with Squishmallows, noting that they are "squishable." For example, the product details for Build-A-Bear's axolotl (a copy of the unique animal that is one of Squishmallows' most popular characters) state:



**Product Details**    Specifications    Gift Options    Store Availability

Skoosherz are our most squishable, lovable and huggable friends! Our fan favorite pink axolotl gets the Skoosherz treatment with this adorable plush. The large, round plush has the axolotl's signature smiley face with fuzzy pink gills on its side. Make a splash with this ultra huggable axolotl friend!

51. Skoosherz products create a likelihood of confusion with original Squishmallows products. In fact, there is evidence of *actual* consumer confusion. For example, on a recent promotional Skoosherz Instagram post, a user asked whether Build-A-Bear was now making Squishmallows:



52.    Other consumers have also noted how similar Skoosherz are to Squishmallows. Indeed, the official Build-A-Bear Instagram account was forced to clarify that these were indeed Skoosherz, not Squishmallows, when a commentor posted "SQUISHMALLOW!? !?" to Build-A-Bear's promotional video of Skoosherz.



53.    This post is not only conclusive evidence of consumer confusion, but it is also evidence of Squishmallows' above-described secondary meaning. When consumers saw Skoosherz characteristics, they did not refer to them as a build a bear, plush toy, or pink cow, they referred to them as "Squishmallow."

54.     These users were not alone.  Build-A-Bear's Instagram post announcing its new Skoosherz line is riddled with posts calling them "knockoff Squishmallows" and noting the obvious similarities between these new products and the well-known Squishmallows:





DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499









DocuSign Envelope ID: A6FC7479-44D4-4202-BC67-F920FC86B499





55.     Other consumers noted that Skoosherz are "like a worse Squishmallow," even noting that Skoosherz chose to copy several of the most popular Squishmallows characters.  Still

others highlight the fact that Skoosherz represent a radical departure from Build-A-Bear's traditional model of building a custom toy, referring to them as "soulless ripoff[s]":




**lairviniaa** · 10 hr. ago

I'm sorry but I really can't see the appeal 😕 like I collect both squishmallows and bab but these designs are just lazy and look like cheap squishmallow knockoffs (they literally used the most popular squishmallow animals/designs) and like I don't understand why they'd make these (besides wanting an easy cash grab) they have none of the features that make babs special and unique. they didn't even make clothes for them and they're overpriced too (and imo they're not even cute 😤) I mean if you enjoy them I'm happy for you i don't wanna ruin the fun but its just a no from me

**stabby_coffin_salt** · 2 days ago

It's like a worse Squishmallow. I'd rather just get one of those Squishem's or whatever they're called (they have one that's a plague doctor).

These knockoffs remind me of those TY squish things. Can't stand the lack of quality or thought.

The cow is kinda cute I guess?

⊖  ⬆ 177 ⬇   💬 Reply   ⬆ Share   ⋯

**saredarebear** · 2 hr. ago

I feel like if they were going to make something resembling squishmallows they could at least make it so you "build" it and make a line of clothing for it so it does not feel like such a soulless ripoff. It's cute. but Build a Bear has something that is pretty unique and I do not understand why these were released the way they were.

⬆ 3 ⬇   💬 Reply   ⬆ Share   ⋯

56.     Even Build-A-Bear's photos and ad campaigns directly mirro Squishmallows:

<u>**Squishmallows**</u>                              <u>**Skoosherz**</u>



57.     Defendant Build-A-Bear has never had common law trade dress rights to the Squishmallows Trade Dress.

58.     Build-A-Bear's actions have caused and will continue to cause significant harm to Kelly Toys.  As a result of consumer confusion, Kelly Toys has lost and will continue to lose potential customers, sales, and market share.

59.     In sum, Build-A-Bear's willful conduct has damaged and will continue to irreparably damage the reputation, business, and goodwill of Kelly Toys.  And, as can be seen from Build-A-Bear's plans to release additional infringing Skoosherz, unless enjoined, Build-A-Bear will continue to further escalate their infringing activities.

60.     All conditions precedent to the filing of this Action have been performed, have occurred, have been excused, and/or have been waived or otherwise satisfied.

61.     Plaintiffs have retained the undersigned counsel to prosecute this action and is obligated to pay them attorneys' fees for their services in bringing this action and costs associated with the same.

## COUNT I
## COMMON LAW TRADE DRESS INFRINGEMENT

62.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully stated herein.

63.     Kelly Toys owns the Squishmallows Trade Dress.

64.     Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

65.     Simply stated, the Squishmallows Trade Dress has a secondary meaning that, when viewed as a whole, presents a non-functional look that is uniquely associated with Squishmallows and Kelly Toys.

66.     At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

67.     Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows. Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior. Simply stated, the design of Squsihmallows and Skoosherz are confusingly similar.

68.     Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

69.     Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead. By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

70.     Defendant Build-A-Bear's continued marketing and distribution of "Skoosherz" that so closely resemble Squishmallows has and will continue to cause a likelihood of confusion, mistake, and deception in the marketplace and among customers, causing irreparable harm to Plaintiffs and in violation of Plaintiffs' common law trade dress rights.

71.     As a result of Defendant's infringement, Plaintiffs have been damaged by the resulting confusion.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant for damages, prejudgment, and post-judgment interest and award other and further relief as this Court deems just and proper.

**COUNT II**
**COMMON LAW UNFAIR COMPETITION**

72.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

73.     Defendant's infringing products incorporate matter constituting reproductions, copies, and/or colorable imitations of Kelly Toys' Squishmallows Trade Dress.  Defendant's unauthorized use of Kelly Toys' Squishmallows Trade Dress constitutes unfair competition and is likely to cause confusion and mistake in the minds of the trade and the purchasing public as to the source of Defendant's products and to cause purchasers to believe that Defendant's products are authentic products of Kelly Toys when in fact, they are not.

74.     Defendant has intentionally appropriated Kelly Toys' Squishmallows Trade Dress with the intent of causing confusion, mistake, and deception as to the source of its goods and with the intent of palming off Defendant's goods as those of Kelly Toys.  Defendant has thus committed unfair competition under the common law of the State of Florida.

75.     By its actions in infringing Kelly Toys' Squishmallows Trade Dress, Defendant is improperly trading upon the reputation and goodwill, and impairing valuable rights in, the Squishmallows Trade Dress.

76.     Said activities of Defendant have caused irreparable harm and damage to the rights in the Squishmallows Trade Dress and to Kelly Toys' business reputation and goodwill.

77.     As a result of Defendants' conduct, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant for damages, prejudgment, and post-judgment interest and award other and further relief as this Court deems just and proper.

## COUNT III
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
Florida Statute § 501.021, *et seq.*

78.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

*79.*     This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute Section 501.201, *et seq.* ("FDUTPA").

80.     A primary purpose of FDUTPA is "[t]o protect the consuming public and ***legitimate business enterprises*** from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat. (emphasis added).

81.     Plaintiffs have standing to sue under FDUTPA because they are legitimate business enterprises that were directly harmed by Defendant's unfair business practices.

82.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress.  Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the Squishmallows Trade Dress as high-quality goods connected with or offered by Kelly Toys.

83.     At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

84.     Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

85.     Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

86.     Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead.  By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

87.     Even further, Build-A-Bear infringed on the Squishmallows Trade Dress when Build-A-Bear tricked Squishmallows' manufacturer into making Skoosherz.  Build-A-Bear knew or had reason to know that the Squishmallows Trade Dress was improperly obtained and copied. In fact, the Squishmallows manufacturer told Build-A-Bear that its designs too closely resembled Squishmallows. Nonetheless, Build-A-Bear used the same manufacturer in an attempt to benefit from the goodwill and brand recognition associated with Squishmallows.

88.     Defendant's actions as indicated herein were and are willful and constitute an unfair method of competition, an unconscionable act or practice, and/or an unfair or deceptive act or practice in violation of § 501.204, Fla. Stat.

89.     Further, Defendant's actions are likely to mislead (and have actually mislead) the consumer acting reasonably in the circumstances, to the consumer's detriment.

90.     Defendant's actions have directly caused actual damage to the Squishmallows brand and Plaintiffs individually.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Defendant, award Plaintiffs attorneys fees and costs pursuant to § 501.2105, Fla. Stat., award injunctive relief pursuant to § 501.222(1), Fla, Stat., and award other and further relief as this Court deems just and proper.

## COUNT IV
## PRELIMINARY INJUNCTION

91.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

92.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress.  Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

93. At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

94. Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows. Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

95. Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

96. Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying Skoosherz instead. By naming its products that so closely resemble Squishmallows "Skoosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skoosherz instead. Importantly, there is evidence of *actual* customer confusion.

97. Defendant's actions have caused direct damage to the Squishmallows brand and Plaintiffs individually. Defendant's actions must be stopped.

98. Plaintiffs have no adequate remedy at law. If Defendant ais permitted to continue to misappropriate the Squishmallows Trade Dress, Plaintiffs' damages based on Defendant's misrepresentations will only continue to increase.

99. Monetary damages alone will not correct or remedy the damages caused by Defendant.

100. Plaintiffs have a substantial likelihood of success on the merits.

101.    Plaintiffs have a clear legal right to the relief sought.

102.    Absent injunctive relief, Defendant will continue to improperly use the Squishmallows Trade Dress, and Plaintiffs will continue to suffer irreparable harm.

103.    If Defendant is allowed to continue to improperly use the Squishmallows Trade Dress, the injury to Plaintiffs would outweigh any alleged harm an injunction may cause Defendant.

104.    An injunction will serve the public interest as Defendant is creating confusion in the market and misleading consumers into believing "Skoosherz" are associated with Squishmallows.  They are not.

WHEREFORE, Plaintiffs respectfully request that this Court enter a preliminary injunction, requiring that Defendant:

1.  Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skoosherz products;

2.  Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

3.  Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4.  Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

5. Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6. Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7. Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

8. Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

9. Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

11. And any further relief this Court deems just and proper.

**COUNT V**
**PERMANENT INJUNCTION**

105.     Plaintiffs reaffirm and reallege paragraphs 1 through 61 as if fully set forth herein.

106.     Kelly Toys Holdings, LLC is the exclusive owner of all right, title, and interest in and to the Squishmallows Trade Dress.  Beginning in 2016 and continuing without interruption, Kelly Toys and its predecessor have expended a great deal of time, effort, and money in the promotion of its Squishmallows line.  In fact, because of Kelly Toys' extensive promotional activities and widespread display of plush toys embodying the Squishmallows Trade Dress directed to the public, and as a consequence of Kelly Toys' well-earned reputation for fairness and integrity in dealings with its customers, the relevant consuming public has come to recognize and associate plush toys embodying the trade dress as high-quality goods connected with or offered by Kelly Toys.

107.     At no time has Kelly Toys transferred any rights in the Squishmallows Trade Dress, name, brand, likeness, or otherwise to Defendant Build-A-Bear.

108.     Notwithstanding the foregoing, on January 11, 2024, Build-A-Bear launched "Skoosherz," a line of plush toys that copies and imitates Squishmallows.  Skoosherz toys have the *same* distinctive trade dress as the popular Squishmallows, including: shaped fanciful renditions of animals/characters; simplified Asian style Kawaii faces; embroidered facial features; distinctive and non-monochrome coloring; and short-pile exterior.

109.     Through "Skoosherz," Defendant purports to be associated with the Squishmallows. It is not.

110.     Moreover, not only do Skoosherz visually and tactilely simulate Squishmallows, but Build-A-Bear has also tried to trick customers looking for Squishmallows into buying

Skooosherz instead.  By naming its products that so closely resemble Squishmallows "Skooosherz," Build-A-Bear has taken steps to ensure that customers seeking out Squishmallows (often referred to as "Squish") become mistaken by the confusingly similarly named Skooosherz instead. Importantly, there is evidence of *actual* customer confusion.

111.    Defendant's actions have caused direct damage to the Squishmallows brand and to Plaintiffs individually.  Defendant's actions must be stopped.

112.    Plaintiffs have no adequate remedy at law.  If Defendant ais permitted to continue to misappropriate the Squishmallows Trade Dress, Plaintiffs' damages based on Defendant's misrepresentations will only continue to increase.

113.    Monetary damages alone will not correct or remedy the damages caused by Defendant.

114.    Plaintiffs have a substantial likelihood of success on the merits.

115.    Plaintiffs have a clear legal right to the relief sought.

116.    Absent injunctive relief, Defendant will continue to improperly use the Squishmallows Trade Dress, and Plaintiffs will continue to suffer irreparable harm.

117.    An injunction will serve the public interest as Defendant is creating confusion in the market and misleading consumers into believing "Skooosherz" are associated with Squishmallows.  They are not.

WHEREFORE, Plaintiffs respectfully request that this Court enter a permanent injunction, requiring that Defendant:

1.    Immediately cease manufacturing, distributing, advertising, offering to sell or selling its infringing products or any colorable imitations of the Squishmallows Trade Dress, including, but not limited to, any Skooosherz products;

2.  Immediately cease using the Squishmallows Trade Dress or any confusingly similar trade dress in connection with plush or other toys including, but not limited to, any Skoosherz products;

3.  Immediately cease using the Squishmallows Trade Dress, or any confusingly similar trade dress, in connection with the advertisement, offer to sell, or sale of any toy products including, but not limited to, any Skoosherz products;

4.  Immediately cease using imitations of the Squishmallows Trade Dress in connection with plush toys or other goods including, but not limited to, any Skoosherz products;

5.  Immediately cease infringing or contributing to infringement of Kelly Toys Holdings, LLC's trade dress, or otherwise engaging in unfair competition with Kelly Toys in any manner or engaging in any conduct tending to falsely represent or likely to confuse, mislead, or deceive suppliers, purchasers, or any member of the public into thinking that Defendant or any of their products are affiliated with Kelly Toys or that Kelly Toys has otherwise sponsored, approved, or licensed any products or services of Defendant including, but not limited to, any Skoosherz products;

6.  Immediately cease engaging in any other activity constituting unfair competition with Kelly Toys, or constituting infringement of the Squishmallows Trade Dress including, but not limited to, the sale of any Skoosherz products; and

7.  Immediately cease assisting, aiding, or abetting any other person or business entity in engaging or performing any of the activities referred to in subparagraphs (1) through (6) above, or effecting any assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (1) through (6) above;

8. Be directed to file with the Court and serve on Kelly Toys, within thirty (30) days after entry of a final injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

9. Preserve any and all communications with the manufacturer of Skoosherz, including but not limited to, communications with the Squishmallows' Chinese manufacturer;

10. Preserve any and all internal communications as well as communications with franchisees, affiliates, and subsidiaries about Skoosherz, their creation, manufacturing, sale, design, origin, name, and future; and

11. And any further relief this Court deems just and proper.

## **VERIFICATION**

I declare under penalty of perjury that I have read the foregoing Verified Complaint, and the facts contained herein, are true and correct to the best of my knowledge.

January 29, 2024 | 11:07 AM EST

Jazwares, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Toys Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Kelly Amusement Holdings, LLC
By: Jack Elum
Its: Authorized Representative

January 29, 2024 | 11:07 AM EST

Jazplus, LLC
By: Jack Elum
Its: Authorized Representative

Respectfully submitted this 29th day of January, 2024, by:

ZEBERSKY PAYNE SHAW LEWENZ, LLP
110 S.E. 6th Street, Suite 2900
Fort Lauderdale, FL  33301
Telephone: (954) 595-6060
Facsimile: (954) 989-7781
Email: ezebersky@zpllp.com; jshaw@zpllp.com;
zludens@zpllp.com; lpalen@zpllp.com;
mlomastro@zpllp.com

 */s/ Jordan A. Shaw*
EDWARD H. ZEBERSKY, ESQ.
Fla. Bar No.: 908370
JORDAN A. SHAW, ESQ.
Fla. Bar No.: 111771
ZACHARY D. LUDENS, ESQ.
Fla. Bar No.: 111620
LAUREN N. PALEN, ESQ.
Fla. Bar No.: 1038877

# **EXHIBIT 1**

# JAZWARES, LLC
# VENDOR PARTNERSHIP MANUAL

## STANDARD TERMS AND CONDITIONS

1. **DEFINITIONS.** As used in this Agreement or any Order, the following capitalized words shall have the following meanings:
   a. Company shall mean "Jazwares, LLC." Supplier shall mean "Vendor."
   b. Account shall mean any right to receive payments arising under this Agreement.
   c. Merchandise shall mean all products, goods, materials, equipment, articles, and tangible items supplied by Supplier to Company and all packaging, instructions, warnings, warranties, advertising and other services included therewith.
   d. Authorized Buyer shall mean any Buyer, Sourcing Manager, Merchandise Director or Company employee assigned to the specific Vendor's account corresponding to the purchased Merchandise.
   e. Order shall mean any written or electronic purchase order issued by Company.
   f. Recall shall mean any removal of Merchandise from the stream of commerce initiated by Supplier, a government entity or Company.
   g. Standards shall mean the Jazwares, LLC. Standards for Suppliers, as may be amended from time to time. It is the obligation of the Supplier to obtain this Vendor Partnership Manual as it may be changed from time to time. This Manual can be obtained by contacting your contact at Jazwares.

2. **ORDERS; CANCELLATION.**
   a. Supplier may ship only after receipt of an Order. Goods not shipped in accordance with this Agreement and the applicable Order will be at the Supplier's risk and expense. Acceptance of an Order is expressly subject to all of the terms and conditions of such Order, including, all shipping, routing and billing instructions and all attachments delivered therewith. The Supplier formally accepts an Order and an Order becomes a contract between the Supplier and the Company when: (i) shipment of all or any portion of the goods covered by the Order shall be made; or, (ii) Supplier fails to notify Company of Supplier's non-acceptance of the Order or amendments thereto within (7) days of the issuance date of the Order.
   b. Unless otherwise specified, all Merchandise shall be shipped Free on Board (FOB) port of export as enumerated in the INCOTERMS 2000 designated by the International Chamber of Commerce. Supplier shall deliver the Merchandise on board the Carrier's vessel as designated by Company or Company's agent at the named port of shipment and on the date, or within the period, stipulated on the Order and in the manner customary at the port. Supplier shall provide the Merchandise in conformity with the Order and shall obtain at its own risk and expense any export license or other official authorization and carry out all customs formalities necessary for the exportation of the Merchandise. Supplier shall pay all costs relating to the Merchandise, including any consolidation costs, until such time as they have passed the ship's rail at the named port of shipment and the costs of customs formalities necessary for exportation as well as all duties, taxes and other official charges payable upon exportation.
   c. In the event that Merchandise must be shipped by air solely due to Supplier's inability to meet in store dates, Supplier will be responsible for any and all air freight charges and must reimburse Company for any and all additional costs incurred as a result. Supplier shall only use air freight forwarders approved by Company, such approval shall not be unreasonably withheld. Any international shipping costs included in the cost of Merchandise sold must be separately documented. Documentation necessary for payment will not be released until payment of all such transportation charges is received by Company. This option shall only be used in those circumstances when failure to receive and stock the product in a

timely manner will have a material adverse effect on the sale of the product (e.g. seasonal items).

d. Supplier's invoice, confirmation memorandum or other writing may not vary the terms of any Order or this Agreement.

e. Supplier's failure to comply with one or more terms of an Order shall constitute an event of default and shall be grounds for the exercise by Company of any of the remedies provided for in this Agreement or by applicable law. Company may cancel all or any part of an Order at any time without any liability if: (i) Supplier fails to materially comply with one or more terms of an Order; (ii) Supplier shall become insolvent, bankrupt, or make a general assignment of the benefit of creditors; (iii) proceedings are commenced against Supplier under functionally similar laws of a country; (iv) at any time Supplier shall default in performance or shall so fail to make progress in the work as to endanger performance, and provided Supplier shall not remedy such default within ten (10) days after written notice by Company; or, (v) if additional duties, fees, quotas or other restrictions are imposed on the Merchandise that is the subject of this Agreement by the Government of the United States or the government of the country of origin or country of exportation beyond those which existed on the date of the issuance of the Order.

f. Only the issuance of an Order creates an obligation upon Company. Projections, past purchasing history and representations about quantities to be purchased are not binding, and Company shall not be liable for any act or expenditure (including but not limited to expenditures for equipment, materials, packaging or other capital expenditures) by Supplier in reliance on them.

3. SUPPLIER FINANCIAL INFORMATION; SALES TO COMPANY. Supplier shall, upon request, submit to Company with this Agreement one of the following: (1) a complete set of audited current financial statements, or its reasonable equivalent, (2) a current Dun & Bradstreet financial report (or its equivalent), or (3) if publicly held, Supplier's most recent annual report to shareholders and management proxy information. Company agrees to maintain the confidentiality of the information provided in accordance with Section 16 of this Agreement. If Company's purchases from Supplier are anticipated by Supplier to constitute twenty percent (20%) or more of Supplier's gross annual sales on a calendar year basis, Supplier agrees to notify Company of this fact, in writing, within thirty (30) days of Supplier becoming aware of such possibility.

4. PAYMENT TERMS.

a. Payment will be made by T/T net 60 days upon Company's receipt and approval of all the completed documentation of the Purchase Order and this Agreement. Necessary documentation includes Originals of Bill of Ladings, Forwarder Cargo Receipt, Packing Lists, Testing Reports and Mates Receipts.

b. Notwithstanding the preceding sentence, no payment will be issued until appropriate documentation is issued AND the invoice, and any other document required under this agreement is received.

c. Company will only pay for approved and accepted finished goods per issued Purchase Orders, regardless of any unused materials or work in progress.

5. SET-OFF; RESERVATION OF ACCOUNT; CREDIT BALANCE. Company may set off against amounts payable under any Order all present and future indebtedness of Supplier to Company arising from this or any other transaction whether or not related hereto. If Company reasonably determines that Supplier's performance under an Order and/or this Agreement is likely to be impaired, Company may establish a reserve on Supplier's Account to satisfy Supplier's actual or anticipated obligations to Company arising from any such Order or this Agreement, by withholding payment of Supplier's invoices. Supplier agrees that any credit balance will be paid in cash to Company upon written request.

6. NOTICE REGARDING ASSIGNMENT OF ACCOUNTS; ACCOUNT DISPUTES. Supplier shall provide Company written notice of an assignment, factoring, or other transfer of its Account at least

30 days prior to such assignment, factoring, or other transfer taking legal effect. Such written notice shall include the name and address of the assignee/transferee, the date the assignment is to begin, and terms of the assignment, and shall be considered delivered upon receipt of such written notice by Company through its Direct Import Department. Supplier may have only one assignment, factoring or transfer of its Account effective at any time. The assignment of any Account hereunder shall not affect Company's rights set forth in Section 5 of this Agreement. In accordance with the terms of this Agreement, Supplier shall defend indemnify and hold Company harmless from any and all lawsuits, claims, demands, actions, damages (including reasonable attorney fees, court costs, obligations, liabilities or liens) arising from or related to the assignment, transfer or factoring of its Account. Supplier releases and waives any right, claim or action against Company for amounts due and owing under this Agreement where Supplier has not complied with the notice requirements of this provision. Notices required pursuant to this Section shall be mailed to: Jazwares, LLC., Attn: Direct Import Department, 1067 Shotgun Rd, Sunrise, FL 33326. Notwithstanding the foregoing, any dispute or any other circumstance, Company reserves the right to remit payment to Supplier.

7.   TAXES.  The prices set forth in any Order are deemed to include all taxes of any kind, other than duties upon the importation of the goods. If any manufacturer's excise or other similar or different taxes are paid on the Merchandise described in any Order and if such tax, or any part thereof, is refunded to Supplier, then Supplier shall immediately pay Company the amount of such refund.

8.   PRICE GUARANTEE AND NOTICE OF PRICE INCREASES.  Prices contained in any Order are guaranteed by Supplier against manufacturer's or Supplier's own price decline until date of the final shipment under the Order. If there is a price increase, Supplier shall give Company written notice of any such increase at least sixty (60) days prior to the effective date of the increase.

9.   SUPPLIER SYSTEMS RESPONSIBILITIES.
     a.   Supplier shall receive Orders and send Company invoices physically, through mail or via email or other acceptable format, unless otherwise agreed to by Company in writing.
     b.   Supplier shall assure that access by its employees to email is restricted to persons authorized to contractually bind Supplier.
     c.   Purchase Orders will be deemed accepted by Supplier if: (i) There is written confirmation by Supplier; (ii) There is electronic acknowledgment by Supplier; (iii) The Purchase Order is not rejected by Supplier within seven (7) days after receipt by Supplier OR (iv) Supplier undertakes to provide the materials, services or work

10.  PURCHASE COSTS AND CONDITIONS.  Supplier is responsible for verifying the accuracy of costs, discounts, allowances and all other terms of sale on all Orders. If incorrect information exists, Supplier shall notify Company not less than twenty-four (24) following acceptance of Purchase Order by Supplier. If a change is necessary, no shipment is to commence without written confirmation of the change from an Authorized Buyer. If Merchandise ships prior to discovery of an error on the Order, the parties shall confer within forty-eight (48) hours of such discovery to determine the actions to be taken regarding the erroneous Order.

11.  PRODUCT TESTING.  Company requires testing of approval, pre-production, production and in-store samples by a lab selected by the Company. Starting with all toys manufactured after December 31, 2011. all children's products must be tested by a Third Party laboratory whose accreditation is accepted by the CPSC in order to meet Toy Safety Standards as set forth by the CPSC. Based on the results of such testing, Company must issue a written Children's Product Certificate which certifies the compliance of each covered toy to the Toy Safety Standard. Supplier must make available all required pre-production and production samples. Supplier shall be responsible for all testing charges, which will be billed directly to the Supplier. Company shall have the right to cancel any Order, without incurring any liability, for which Company has reasonably determined that preproduction or production samples do not satisfy Company's specifications.

12. ETHICAL STANDARDS.

    a.  Supplier agrees to disclose all factories and subcontractors producing Merchandise to Jazwares, LLC. All factories supplying Merchandise shall be subject to audit by Company, its agents or employees and, if applicable, governmental agencies. Supplier agrees to notify Company immediately in the event of any visits made by U.S. Customs and Border Protection personnel including visits by a U.S. Customs and Border Protection Textile Production Verification Team at the production facilities of Supplier or Supplier's Subcontractor(s). Failure to notify Company of such a visit shall be grounds for Company to cancel any unshipped Orders placed with the Supplier.

    b.  Company shall have the right, on its own or through an independent agent to: (i) audit at any time during normal business hours all production facilities where the Merchandise is being produced and any Merchandise being produced and (ii) inspect and/or test Merchandise prior to shipment. Supplier shall cooperate with such inspections and/or tests, and provide all reasonable assistance for the safety and convenience of such inspectors in the performance of such inspections, including providing adequate facilities at the production facilities.

    c.  Company, on its own or through an agent, shall have the right to make unannounced visits to Supplier's production facilities, and those of any subcontractor(s), for purposes of reviewing production records, documents specified in Section 15, and any other documents requested by Company.

13. REJECTIONS/OVERRUNS.

    a.  Company may, in its sole discretion, and in addition to such other remedies provided under law or this contract, reject the Merchandise if Company finds at any time that any of the Merchandise ordered, due to the Supplier's negligence: (i) is defective in design, workmanship or materials, or otherwise not in conformity with the requirements of the Order or applicable government regulations; (ii) is denied or restricted entry into the United States for any reason; (iii) is unsafe or recalled based upon any law or regulation; (iv) infringes a trademark, patent, or copyright; (v) is materially or functionally different from approved samples or specifications or, (vi) is found to have been produced under conditions that violate the Company's Standards. All Merchandise is subject to inspection in the factories and elsewhere. Rejected Merchandise must be destroyed or salvaged by a salvage company approved by Company.

    b.  Supplier shall remove any and all identifying marks from the rejected Merchandise or overrun merchandise, including but not limited to tags, labels, Company's brand name labels, other exclusive brand name labels, and carton markings. For all Merchandise that is exclusive to Company or contains any Company intellectual property, Supplier shall hold the rejected or overrun Merchandise, and is prohibited from reselling the rejected Merchandise. Supplier shall not, under any circumstances, advertise or market the rejected or overrun Merchandise using Company's name or the name(s) of any of Company's affiliates. Violation will result in extraordinary harm to Company and Supplier will be responsible to repay to Company for all damages, economic and non-economic, as well as pay to Company any and all court courts and attorney's fees.

14. RETURN POLICY.  Supplier will manufacture an additional Two-percent (2%) of all goods ordered at Supplier's expense. These additional units, at the sole discretion of Company, will either be stored at the factory or at another location the Company desires. In the event returns exceed Two-percent (2%),unless otherwise indicated, and notwithstanding any other remedy provided for under law or this Agreement, Supplier will be charged a claim, above the Two-percent (2%) in an amount equal to the Company's Customer Store Costs (as will be proven by company if requested) of the returned Merchandise, incidental packaging and shipping expenses (if the returned Merchandise was shipped, freight pre-paid, to the Supplier's Customers U.S. Stateside facility), trash removal costs (if the Merchandise is ultimately destroyed ), and a 10% handling charge for all Merchandise

that is returned to Supplier by its Customer. Supplier will be responsible for 100% payment of claim by check or wire transfer within 30 days of claim date.

15. SUPPLIER RESPONSIBILITIES.

    a. Unless otherwise agreed in writing, Supplier who is shipping containers to Company will be responsible for monitoring their shipping process until such time as they have passed the ship's rail at the named port of shipment including closing the container and sealing it with a Supplier-provided seal. The seal number must be referenced and identified as the seal number on all copies of the Bill of Lading. If Supplier fails to seal a container, the ocean cargo manager ("OCM") or carrier will seal the container on Supplier's behalf. The OCM or carrier will then document that seal number on the Bill of Lading before providing Supplier with its copy. If a shortage occurs, Supplier shall be liable for such shortage.

    b. Supplier shall aid Company in assuring that the Merchandise is not tampered with, that no additional items are inserted into the shipping container, and that the supply chain is secure. Supplier shall endeavor to control access to warehouse, storage and shipping areas, monitor employees and visitors that may have access to Merchandise and shipping containers, and establish adequate security procedures. Supplier shall comply with the requirements of the factory/container security requirement notification received with each Order. Supplier shall permit Company, its agents or employees to inspect security measures, and will endeavor to improve security as requested by Company or U.S. Customs and Border Protection. Supplier agrees to develop and implement a sound plan to enhance security procedures in accordance with the Manufacturer Security Guidelines pursuant to the U.S. Customs and Border Protection Customs-Trade Partnership Against Terrorism (C-TPAT), which shall be incorporated herein by reference.

    c. All commercial invoices must show the Company's order number, Supplier's style number, quantity, unit prices, total prices, complete and accurate descriptions of the merchandise, and other information required and reasonably requested by Company.

    d. Supplier shall provide Company or its agent with all documentation, within its control to obtain, necessary for the international shipment, exportation from the exporting country, and importation into and full release for consumption into the Customs Territory of the United States in compliance with all governmental agencies having authority, and shall promptly respond to requests by U.S. Customs and Border Protection, other U.S. Government agencies, or Company for additional documentation. For wearing apparel, textile shipments or other items that may be subject to quota, Supplier shall obtain sufficient quota and necessary export visas for the importation of the Merchandise into the United States. Supplier shall ensure that all export visas reflect the actual quantity and value of the Merchandise subject thereto and correspond with the negotiated prices and quantities disclosed in the commercial documents for the goods. Supplier shall also provide Company with all necessary declarations for proper entry of the apparel and textile goods. For footwear shipments, Supplier shall provide Company or its agent with completed interim footwear invoices ("IFI's) and any other information necessary to correctly classify the footwear under the Harmonized Tariff Schedule of the United States, as in effect at the time of importation. Supplier shall provide Company with any rulings issued by the U.S. Customs and Border Protection to the Supplier, its agent or related company on the classification or admissibility of the Merchandise. If Supplier fails to supply Company or its agent with complete proper documentation required from Supplier, Company may at its sole discretion, and without prejudice to any other remedy provided for under the law or this Agreement, cancel the shipment of Merchandise. In such event, Supplier shall incur all costs pertaining to the canceled shipment.

    e. Supplier agrees to maintain, and to instruct its subcontractor(s) to maintain, certain documents and records for each style number of Merchandise produced under this Agreement, as specified by Company, for a period of five (5) years following the date of shipment to the United States. These documents and records may include, but are not limited to, the following: raw material receiving records; cutting and sewing tickets; production orders; knitting machine tickets; daily production records; export and shipping records; employee timecards; and, wage/payment/salary records.

f.   Supplier shall maintain all necessary certifications that are required within the industry where it makes product. Supplier shall abide by all Laws and regulations, including but not limited to the CPSIA. Company requires all Toy Suppliers to be ICTI certified and Supplier agrees that all ICTI certification must be current and in good standing.

16. CONFIDENTIAL INFORMATION; NONDISCLOSURE; INTELLECTUAL PROPERTY.

a.   Supplier shall not at any time, during or after the Term of this Agreement, disclose to others, take or use for its own purposes or the purpose of others, any of Company's confidential information, knowledge, designs, data, know-how, trade secrets, or any other information considered "confidential" or "proprietary" by Company. Supplier understands, agrees and recognizes that this obligation applies, but is not limited to, technical information, designs, marketing and financial information, and any business information that Company treats as confidential. Any confidential information, knowledge, designs, data, know-how, trade secrets, or any other information considered "confidential" or "proprietary" by Supplier which the Supplier shall have disclosed or may hereafter disclose to the Company and which in any way relates to the goods or services covered by this order, agreement or contract, shall, unless otherwise specifically agreed to in writing by the Company be deemed to be confidential or proprietary information and further shall be acquired by the Company from any restrictions (other than a claim for patent infringement) as part of the consideration for this order, agreement or contract. No cause of action will arise on Supplier's behalf for Company's use of any confidential information disclosed to Company, and no damages whatsoever shall accrue to Supplier for Company's use thereof. Supplier shall keep confidential any and all technical processes and information, economic and financial information, designs, data, marketing information, and any other business information that Company treats as confidential furnished to Supplier in connection with this order, agreement or contract and Supplier shall not divulge, export or use directly or indirectly, such information for the benefit of any other party without obtaining Company's written permission. Supplier shall return all items belonging to Company and all copies of documents containing such confidential information in Supplier's possession or under Supplier's control upon request by the Company or termination of this Agreement.

b.   Absent a separate express agreement between Supplier and Company and after one year from date of importation of Merchandise into the United States which in any way relates to the goods or services covered by an Order, Supplier will irrevocably grant to Company a full paid up, royalty free license to make, use, sell and offer for sale any such Merchandise free of any claim of infringement or misappropriation of any intellectual property of Supplier. The aforementioned paid up license will remain in effect until the expiration of any intellectual property relating in any way to the Merchandise.

c.   Should the Company or its representative(s) suggest any modifications, changes, alterations, revisions, adaptations or amendments in any way (including but not limited to design and color) (collectively "modified Merchandise") to Merchandise presented to Company which in any way relates to the goods or services covered by this order, agreement or contract, then all such intellectual property related to such suggestions and/or modified Merchandise shall become the exclusive property of Company, including but not limited to any intellectual property rights relating thereto.

17. DELIVERY TIME.

a.   THE TIME SPECIFIED IN AN ORDER FOR SHIPMENT OF MERCHANDISE IS OF THE ESSENCE OF THIS AGREEMENT AND IF SUCH MERCHANDISE IS NOT SHIPPED WITHIN THE TIME SPECIFIED, AND IS NOT THE RESULT OF ACTIONS OF THE COMPANY OR ITS AGENTS, SUCH FAILURE SHALL BE CONSIDERED A MATERIAL BREACH OF THIS AGREEMENT, AND COMPANY RESERVES THE RIGHT, AT ITS OPTION AND WITHOUT LIMITATION, TO CANCEL ALL OR ANY PART OF THE ORDER AND/OR REJECT ANY MERCHANDISE DELIVERED AFTER THE TIME SPECIFIED IN THE ORDER. Additionally, Company shall be entitled to impose the following penalties on the Supplier: (i) For all Purchase Orders wherein the product is not completed and shipped on specified ship date on Purchase Order, Company shall be entitled to deduct 1% from

Purchase Order for each day of delay beyond the accepted and agreed upon Purchase Order ship date per item; and  (ii) For all Purchase Orders not shipped completely, or partially, by Supplier within 10 business days of required ship date, Supplier will pay all costs and charges for air freight for the remaining (not yet shipped) products to Company's customers, wherever located. (worldwide).  In addition to the aforementioned remedies, Company may exercise any other remedies provided for in this Agreement or provided by applicable law, including but not limited to holding Supplier responsible to pay all lost profits, expedited shipping fees, testing charges, etc... Notwithstanding Company's right to cancel shipment, or to reject or revoke acceptance of Merchandise, Supplier agrees to inform Company immediately of any actual or anticipated failure to ship all or any part of an Order or the exact Merchandise called for in an Order on the shipment date specified.

b.   Acceptance of any Merchandise shipped after the specified shipment date shall not be construed as a waiver of any of Company's rights or remedies resulting from the late shipment.

c.   Partial on-time delivery will not excuse non-delivery or late delivery of the balance of the Order, in which case Company may elect to cancel the Order and return Merchandise received, or retain Merchandise received and cancel the balance of the Order.

18. REPRESENTATIONS, WARRANTIES AND GUARANTEES.  By acceptance of an Order, Supplier represents, warrants and guarantees that:

a.   Good title to Merchandise will be transferred to the Company, and the Merchandise will be free from any security interest, lien or encumbrance;

b.   The Merchandise will be of best workmanship, new and not used, remanufactured, reconditioned or refurbished, and will comply with all specifications contained in such Order and will be of equal or better quality as all samples delivered to Company;

c.   All statements on the packing lists shall be accurate and the Company may rely thereon;

d.   The Merchandise is genuine and is not counterfeit, adulterated, misbranded, falsely labeled or advertised or falsely invoiced within the meaning of any applicable local, state or federal laws or regulations, and the prices and other terms and conditions of sale comply with all such laws, ordinances, codes and regulations;

e.   The Merchandise, or the sale thereof by Company, is not in violation of any laws, ordinances, statutes, rules or regulations of the United States or any state or local government or any subdivision or agency thereof, including but not limited to: the Foreign Corrupt Practices Act, all laws and regulations relating to health, safety, environment, serial and identification numbers, labeling and country of origin designation, toxic substances, and the requirements of California Proposition 65 and other state "right to know" laws, reasonable and representative tests made in accordance with the requirements of the Flammable Fabrics Act (if applicable) show that the Merchandise is not so highly flammable as to be dangerous when worn by individuals;

f.   The Merchandise shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit and safe for the purposes for which the same are intended to be used, including but not limited to consumer use, and its the suppliers duty to ensure that all lab reports Pass any and all requirements as set out by the third party testing facility;

g.   The Merchandise does not infringe upon or violate any patent, copyright, trademark, trade name, trade dress, trade secret or, without limitation, any other rights belonging to others, and all rights, permissions and authorizations required to provide the Merchandise to Company have been obtained and all royalties and license fees relating to Merchandise have been paid and will continue to be paid by Supplier. Supplier will supply to Company written authorization, permission and/or license agreement to use any Intellectual Property incorporated into Supplier's Merchandise that is not owned by Supplier.

h.   All weights, measures, sizes, legends or descriptions printed, stamped, attached or otherwise indicated with regard to the Merchandise are true and correct, and conform and comply with all laws, rules, regulations, ordinances, codes and/or standards of federal, state and local governments relating to said Merchandise;

i.   All Merchandise shall have an accurate manufacturer-assigned UPC or EAN number that complies with Company's UPC/EAN requirements, as amended from time to time;

j.   All Merchandise shall be appropriately packaged, marked and labeled in accordance with International Maritime Dangerous Goods (IMDG) Code and 49 CFR § 171, et seq., or other applicable code;

k.   There is no other impediment or restriction, legal or otherwise, that limits, prohibits or prevents Supplier from selling and delivering the Merchandise to Company or limits, prohibits or prevents Company from reselling the Merchandise to its customers;

l.   Any statement or claim made by Supplier to Company that the Merchandise qualifies or is otherwise eligible for benefits or preferential treatment under any current or future Free Trade Agreement, bilateral or multilateral international agreement, special preference program, etc (i.e. North American Free Trade Agreement (NAFTA); HTSUS Heading 9801, Andean Trade Promotion Drug Eradication Act (ATPDEA); etc) is true and accurate and the Company may rely thereon. In making such statements or claims to the Company, the Supplier attests that it possesses records and documents and that adequately support claims of eligibility and will Provide Company with copies thereof upon request;

m.   The Merchandise is mined, produced, manufactured, assembled and/or packaged in compliance with the Standards;

n.   The Merchandise is not transshipped for the purpose of mislabeling, evading quota or country of origin restrictions or avoiding compliance with the Standards. If any supplier, manufacturer, subcontractor or agent on behalf of Supplier engages in the practice of transshipment of any purchases, Company, in addition to exercising the remedies provided in this Agreement, and notwithstanding any other remedies provided for under the law or the Agreement, may immediately cancel the Order as well as terminate all current and future business relationships with the Supplier, manufacturer, subcontractor, assignee, and/or agent. In addition, all parties involved and all information obtained may be turned over for prosecution under applicable laws to: the United States Customs Service, the appropriate governmental agency in the country of actual production and the appropriate governmental agency of the country from which the transshipment was to take place;

o.   Where applicable, Supplier agrees to provide Company with a current, complete and accurate Material Safety Data Sheet ("MSDS") for said Merchandise and any information that may be required for the shipment of hazardous materials under international conventions and US law; and

p.   All sales made pursuant to this Agreement are or will be made at not less than fair value under the United States Antidumping Law (19 U.S.C. § 1673 et seq.), and without the use of countervailing subsidies as defined by U.S. Law (19 U.S.C. § 1671 et seq.). Company may at its sole discretion cancel any purchase Order in the event the Merchandise purchased becomes subject to a notice of suspension of liquidation or a notice of final Order by the U.S. Department of Commerce.

It shall be within the reasonable discretion of Company to determine if Supplier has breached the above-mentioned representations, warranties and guarantees. In addition to the representations, warranties and guarantees contained in this paragraph, all other representations, warranties and guarantees provided by law, including but not limited to any warranties provided by the Uniform Commercial Code, are specifically incorporated herein. Nothing contained in this Agreement or an Order shall be deemed a waiver of any representations, warranties or guarantees implied by law.

19.  INDEMNIFICATION.   Supplier shall protect, defend, hold harmless and indemnify Company, including its officers, directors, employees and agents, from and against any and all lawsuits, claims, demands, actions, liabilities, losses, damages, liens, costs and expenses (including, but not limited to, cost of investigating, liquidated damages, economic loss, property damage, personal injury or death, and attorneys' fees and court costs), regardless of the cause or alleged cause thereof, and regardless of whether such matters are groundless, fraudulent or false, arising out of any actual or alleged:

a.   Breach of any representation, warranty or guaranty provide in this Agreement;

b.   Death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or

alleged use of or latent or patent defect in, such Merchandise, including but not limited to (i) any actual or alleged failure to provide adequate warnings, labeling or instructions, (ii) any actual or alleged improper construction or design of said Merchandise, or (iii) any actual or alleged failure of said merchandise to comply with specifications or with any express or implied warranties of Supplier; (iv) unfair competition; (v) Supplier's negligence; (vi) breach by Supplier of this Agreement or any contract applicable to the Merchandise purchased hereunder or which result from any non-conforming delivery (including late or incomplete deliveries);

   c.  Tax or duty that is assessed against Company, by any governmental authority, for Merchandise supplied by Supplier including but not limited to any antidumping or countervailing duties which may be imposed on Merchandise sold at less than fair value under the United States Antidumping Law (19 U.S.C. § 1673 et seq.), and without the use of countervailing subsidies as defined by U.S. Law (19 U.S.C. § 1671 et seq.) sold before the date of publication of the Order applicable to the Merchandise in question and exported before the date of publication of the final antidumping determination;

   d.  Act, activity or omission of Supplier or any of its employees, representatives or agents. Supplier shall promptly notify Company of the assertion, filing or service of any lawsuit, claim, demand, action, liability or other matter that is or may be covered by this indemnity, and shall immediately take such action as may be necessary or appropriate to protect the interests of Company, its officers, directors, employees and agents; or

   e.  Misappropriation or infringement of any patent, trademark, trade dress, trade secret, copyright or other intellectual property right relating to any Merchandise provided to Company by Supplier;

Any and all counsel selected or provided by Supplier to represent or defend Company or any of its officers, directors, employees or agents shall accept and acknowledge receipt of Company's Indemnity Counsel Guidelines, and shall conduct such representation or defense strictly in accordance with such Guidelines. Company shall at all times have the right to direct the defense of, and to accept or reject any offer to compromise or settle, any lawsuit, claim, demand or liability asserted against Company or any of its officers, directors, employees or agents. The duties and obligations of Supplier created hereby shall not be affected or limited in any way by Company's extension of express or implied warranties to its customers.

If Company determines, at its sole discretion, that Supplier's performance under this agreement is likely to be impaired, Company may establish a reserve on Supplier's account to satisfy any actual or anticipated obligations to Company arising from Merchandise provided by Supplier.

20. RECALLS. If Merchandise is the subject of a Recall, (including the issuance of safety notices, violation of the CPSIA etc...), Supplier shall be responsible for all matters and costs associated with the Recall, including but not limited to:

   a.  Consumer notification and contact;

   b.  All expenses and losses incurred by Company in connection with such Recall (and where applicable, any products with which the Recalled Merchandise has been packaged, consolidated or commingled), including but not limited to penalties, refunds to customers, lost profits, transportation costs and all other costs associated therewith; and

   c.  Initial contact and reporting of the Recall to any government agency having jurisdiction over the affected Merchandise.

If a government agency initiates any inquiry or investigation relating to the Merchandise or similar goods manufactured or supplied by Supplier, Supplier shall notify Company immediately thereof and take reasonable steps to resolve the matter without exposing Company to any liability or risk. Additionally, Supplier shall pay for all of Company's attorney's fees and costs associated with any potential action.

21. LIMITATION OF DAMAGES. Other than as explicitly set forth herein, neither party shall be liable to the other for any punitive, special, incidental or consequential damages of any kind (including but not limited to loss of profits, business revenues, business interruption and the like), arising from or relating to the relationship between Supplier and Company, including all prior dealings and agreements, or the conduct of business under or breach of this Agreement or any Order,

Company's cancellation of any Order or Orders or the termination of business relations with Supplier, regardless of whether the claim under which such damages are sought is based upon breach of warranty, breach of contract, negligence, tort, strict liability, statute, regulation or any other legal theory or law, even if a party has been advised by the other of the possibility of such damages. However, Supplier shall be liable to Company for lost profits, business revenues and the like should Company enter into Purchase Orders with third parties in reliance on Purchase Orders entered into between Company and Supplier.

22. REMEDIES.  A party's failure to comply with any material term or condition of this Agreement or any Order shall be grounds for the exercise by the party, at its discretion and without prejudice, of any one or more of the following remedies:

    a. Cancellation of all or any part of the Order without notice, including without limitations the balance of any Order received on installment;

    b. Rejection (or revocation of acceptance) of all or any part of any shipment by Company. Company's right to reject Merchandise shall extend, but not be limited, to Merchandise which is found at any time to be defective in design, workmanship or materials, or otherwise not in conformity with the requirements of the Order or applicable government regulations, Merchandise denied or restricted entry into the United States for any reason, recalled Merchandise, Merchandise that infringes a trademark or patent, and Merchandise that is discovered to be materially or functionally different from approved samples or specifications. Company may, at its option: (i) reject and return such Merchandise at Supplier's expense; (ii) destroy such defective Merchandise; or (iii) require Supplier to inspect the Merchandise and remove and replace nonconforming goods with goods that conform to the Order. If Company elects option (iii) above and Supplier fails to promptly make the necessary inspection, removal and replacement, Company may at its option inspect and sort the Merchandise. Supplier shall pay the cost thereof. Regardless of the option chosen, and at Company's sole discretion, Supplier shall grant a full refund or credit to Company of the invoice price as shown on the Order, of the rejected Merchandise. Company shall be under no duty to inspect the Merchandise before resale thereof and notice of rejection shall be deemed given within a reasonable time if given within a reasonable time after notice of defects or deficiencies has been given to Company by its customers, or regulatory authorities. In respect of any Merchandise rejected by Company, there shall be charged to Supplier all expenses incurred by Company in unpacking, examining, repackaging and storing such Merchandise (it being agreed that in the absence of proof of a higher expense that the Company shall claim any allowance for each rejection at the rate of 10% of the price for each rejection made by Company) and landing and reshipping such Merchandise. Furthermore, in the event that any Merchandise ordered by the Company fails to be delivered or, if delivered, is not acceptable to the Company for any reason and is thereby rejected, the Supplier shall immediately remove and/or destroy any and all labels and other markings identifying the Merchandise with a tradename, trademark, or patent at the Supplier's expense;

    c. Termination of all current and future business relationships;

    d. Withholding of payment to the Supplier;

    e. Setoff against amounts payable under any Order all present, anticipated and/or future indebtedness of Supplier to Company arising from this or any other transaction whether or not related hereto.

    f. Collection by Company from Supplier of any damages it is entitled to under the Agreement, liquidated damages, penalties, taxes and fees, including reasonable attorney's fees, sustained or incurred because of such breach or default, or penalties or liquidated damages claims assessed by or paid to the United States Customs and Border Protection or any other federal, state or local government agency; and/or

    g. Specific Remedies. Without prejudice to Company's rights to remedies provided for under law, contract or other provisions of this Agreement, Supplier shall refund costs or losses incurred as a result of:

        i. Special Handling, including but not limited to re-ticketing, sorting and repacking, banding or repacking, counting pieces, and pulling defective merchandise;

     ii.  Carton Shortages;

    iii.  Damaged Freight resulting from Supplier's inability to satisfactorily package and protect the shipment from damage in transit;

    iv.  Additional Expenses, including but not limited to expenses caused by failure by Supplier to provide necessary and/or correct and accurate shipping documentation (including but not limited to visa for quota goods according to Company's policy and U.S. Customs regulations), failure of product or packaging to meet U.S. Customs regulations, failure of loading product by purchase Order item/assortment, demurrage, storage and handling charges associated to the import freight being held by U.S. Customs due to Supplier's incorrect or missing shipping documents, testing or laboratory charges;(v) Excess Freight, caused by factors including but not limited to shipments made with carriers other than DSL, DATA, Scanwell, or one of Company's contracted carriers, shipments made from a loading port that differs from the F.O.B. point specified in the purchase Order, incorrect cubic measurement quotes, or Supplier failure to meet the load requirements for containers.

h.  If Supplier uses any trademarks, copyrights, patents, trade names, designs, patterns, domain names or other Intellectual Property belonging to or used by Company in an unauthorized manner, Company may obtain a temporary restraining order and/or preliminary injunction to stop such activities, in addition to Company's other remedies hereunder.

i.  When Company has exercised any of the above remedies, Supplier shall not have the right to make a conforming delivery within the contract time. Company, at its sole discretion, may elect (i) to extend the delivery schedule and/or (ii) to waive other deficiencies in Supplier's performance in which case an equitable reduction in the purchase Order price may be negotiated. In the event that Supplier, for any reason, anticipates difficulty in complying with the required delivery date, or in meeting any of the other requirements of an Order, Supplier shall promptly notify Company in writing. Company may require delivery by fastest way possible and charges resulting from such premium transportation must be fully prepaid and absorbed by the Supplier, as provided in this Agreement. The rights and remedies of the Company provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law, including those remedies provided under the Uniform Commercial Code. The remedies available to Company pursuant to this Agreement shall in no way limit any rights which the Company may have at law or in equity by reason of any breach of this contract or any warranties contained herein.

23. **INSURANCE REQUIREMENTS.**

Supplier is required to obtain and maintain insurance coverage with the conditions and in the amounts set forth below. A copy of Suppliers current Certificate of Insurance shall be submitted with this Agreement:

Vendor shall carry product liability insurance covering injury or damages to person(s) or property caused by or resulting from use of the items with liability limits of not less than Five Million Dollars ($5,000,000) per person, per occurrence, and Five Hundred Thousand ($500,000) for property damage. Prior to delivery of any item to Jazwares and any and all subsidiaries, Vendor shall deliver to Jazwares and any and all subsidiaries, a Certificate of Insurance evidencing that the foregoing insurance is in full force and effect; that Jazwares and any and all subsidiaries, has been named upon the insurance policy as an additional insured; that the coverage under said policy and the proceeds thereof shall be effective, in the event of any claim, as of the date of sale of any Item(s) causing injury or damages notwithstanding that as of the date of injury of damage said policy may have been canceled or coverage reduced; and that said policy shall not be canceled or otherwise modified or amended to the detriment of Jazwares and any and all subsidiaries, without the insurer or its authorized agent first giving Jazwares and any and all subsidiaries, ten (10) days prior written notice by certified mail advising Jazwares and any and all subsidiaries, of Vendor's intention to cancel, modify or amend such insurance policy. Upon receipt of any such notice, Jazwares and

any and all subsidiaries, at its option, may cancel any purchase order placed with Vendor for which delivery has not been made.

24. **FORCE MAJEURE.** If any place of business or other premises of a party shall be affected by lockouts, strikes, riots, war, acts of terrorism, fire, civil insurrection, flood, earthquake or any other casualty or cause beyond the party's control, which might reasonably tend to impede or delay the manufacture, delivery, reception, handling, inspecting, processing or marketing of the Merchandise covered by this Agreement, the affected party may, at its option, cancel all or any part of the undelivered Order hereunder by giving written notice to the other party which notice shall be effective upon mailing. If any such events affect Supplier's ability to perform, Supplier will give written notice thereof to Company within five (5) days after any such occurrence. Any costs incurred by a party in connection with any such termination will be born by the affected party.

25. **ASSIGNMENT.** Except as specifically set forth in Section 6, no part of this Agreement or of any Order shall be assignable by Supplier without the written consent of Company, and Company shall not be obligated to accept a tender of performance by any assignee, unless Company shall have previously expressly consented in writing to such an assignment.

26. **PUBLICITY; USE OF NAME AND INTELLECTUAL PROPERTY.** Supplier shall not refer to Company in any advertising or published communication without the prior written approval of Company. Supplier shall not use, or allow to be used, Company's name, logo, trademarks, service marks, patents, copyrights or trade dress without the prior written approval of Company. Company may use Supplier's name, logo, trademarks, service marks, patents, copyrights and trade dress in connection with Company's marketing of the Merchandise.

27. **COMPLIANCE WITH STANDARDS FOR SUPPLIERS.** Supplier agrees to comply with the obligations stated in the Standards, as may be amended from time to time by Company. Company reserves the right to cancel any outstanding Order, refuse any shipments and otherwise cease to do business with Supplier if Supplier fails to comply with any terms of the Standards or if Company reasonably believes Supplier has failed to do so.

28. **COMPLIANCE WITH SUPPLIER SECURITY OBLIGATIONS.** Supplier agrees to comply with the Security Obligations (i.e. Duty of Confidentiality), as may be amended from time to time by Company. Company reserves the right to cancel any outstanding Order, refuse any shipments and otherwise cease to do business with Supplier if Supplier fails to comply with any terms of the Security Obligations or if Company reasonably believes Supplier has failed to do so.

29. **SEVERABILITY; WAIVER.** At the option of Company, no finding that a part of this Agreement is invalid or unenforceable shall affect the validity of any other part hereof. Company's failure to enforce at any time any provision of this Agreement will not be construed as a waiver of such provision or of any rights thereafter to enforce such provision. Any waiver by Company of any of the terms and conditions of this Agreement or any Order must be in writing signed by an authorized representative of Company

30. **FORUM SELECTION; CHOICE OF LAW; STATUTE OF LIMITATIONS.** This Agreement, any and all Orders, and any and all disputes arising thereunder or relating thereto, whether sounding in contract or tort, shall be governed by and construed in accordance with the laws of the State of Florida without regard to the internal law of Florida regarding conflicts of law. Any legal action brought by Supplier against Company with respect to this Agreement or any Orders shall be filed in one of the above referenced jurisdictions within two (2) years after the cause of action arises or it shall be deemed forever waived. This Agreement shall be executed in the English language. In the event of any conflict between this Agreement as written in the English language and any translation, this Agreement written in English shall control. The parties acknowledge that they have read and understand this clause and agree willingly to its terms and conditions. In the event that an action is brought by Company in a different jurisdiction, then Company shall decide the choice

of law and Supplier shall pay all attorneys fees, court fees and any other costs associated with said claim. Additionally, Company may at its sole discretion have any and all claims resolved through binding arbitration.

31. NOTICES.  Unless otherwise specifically provided for herein, any notice or demand which under the terms of this Agreement or under any statute must or may be given or made shall be in writing and shall be given or made by overnight express service addressed as follows: if to Company: Jazwares, LLC., Attn: Direct Import Department, 1067 Shotgun Road, Sunrise, FL 33326. If to Supplier: to Supplier's address set forth below. Such notice or demand shall be deemed given on the second (2nd) business day after deposit of such notice or demand with the overnight express service. The above addresses may be changed at any time by giving prior written notice as provided above.

32. TERM OF AGREEMENT.  This Agreement begins on the Effective Date and continues for a period of two years.  The term of this Agreement will be extended automatically for additional two year terms unless Company provides 30 days written notice prior to the expiration of the then current term of its intention not to renew.  Additionally, Company, upon 60 days written notice at any time, shall have the right, in its sole discretion, and for any reason, to terminate this Agreement.  Neither Supplier nor Company should take any actions in reliance upon this Agreement being extended or renewed. Neither party shall be responsible for any costs incurred by the other in anticipation of the extension or renewal of this Agreement.

33. SURVIVAL OF PROVISIONS.  The provisions of this Agreement which by their nature are intended to survive termination of this Agreement (including but not limited to representations, warranties, guarantees, indemnifications, payment of obligations, remedies, forum selection and statute of limitations) shall survive its termination.

34. INTEGRATION.  The parties hereto agree that this Agreement and any Order constitute the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement. All prior agreements, negotiations, dealings and understandings, whether written (including any electronic record) or oral, regarding the subject matter hereof, are superseded by this Agreement. Any changes in this Agreement shall be in writing and executed by both parties. Furthermore, if there is a conflict of terms between this Agreement and an Order, this Agreement shall be the controlling document.

Vendor understands and agrees that All Purchase Orders that are accepted by Vendor are subject to the TERMS AND CONDITIONS of this MANUAL - TITLED, "JAZWARES, LLC.'S VENDOR PARTNERSHIP MANUAL"

**Vendor Name:** Innoflow Vina Company Limited

Signature: _Kim Kye Soo_

Name: _Kim Kye Soo_

Title: _Production Director_

Date: _May 12 2020_

Address: _Block A2, Do Luong Industrial Cluster Do Luong Commune, Dong Hung District Thai Binh Province, Viet Nam_

_Vendor partnership Manual_